PITTSBURG, FT. WAYNE AND CHICAGO RAILWAY Co. *et al.*

*v.*

THE CITY OF CHICAGO *et al.*

*Filed at Springfield January 17, 1896.*

1. RAILROADS —*permit from city to lay additional tracks—validity of ordinance.* An ordinance requiring a permit for laying additional tracks by a railroad company at a highway crossing, is not invalid, as to a highway crossing within the city, merely because the railroad was built at that place before the highway was laid out, when the place was outside of the municipality.

2. CONSTITUTIONAL LAW—*what is not a deprivation of due process of law.* A railroad company is not deprived of its property without due process of law by reasonable police regulations requiring a permit before additional tracks can be laid at a highway crossing.

3. CONTRACTS—*between State and railroad company—impairment of obligation of.* The obligation of the contract of a railroad company with the State is not impaired by reasonable restraint and regulation of its right to lay additional tracks across a highway.

4. ACTION—*when mandamus, and not injunction, lies.* Where city authorities, without legal excuse, refuse a permit to a railroad company to lay tracks across a street, *mandamus,* and not injunction, is the remedy.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

LOESCH BROS. & HOWELL, for appellants:

The ninth clause of the charter of the Fort Wayne and Chicago Railroad Company was an absolute and unqualified grant of power by the State to the company to construct and maintain its railroad between the Indiana line and Thirty-first street, and across any street or highway then in existence within that territory. *Cook* v. *Railway Co.* 119 Ill. 218.

This is a continuing power, which may be exercised, from time to time, as the needs of the railroad may require. *Railroad Co.* v. *Wilson,* 17 Ill. 121; *Millvale* v. *Railway Co.* 131 Pa. St. 1; *Railroad Co.* v. *Railroad Co.* 113 Ill. 156; *Railroad Co.* v. *Railroad Co.* 149 id. 272.

159—24

It is not in the power of the city arbitrarily to impose other or different terms than such as are contained in the acts of the legislature. *People* v. *Railway Co.* 118 Ill. 113; *Bank* v. *Hamilton*, 21 id. 53; 3 Am. & Eng. Ency. of Law, 741; *Bank* v. *Philadelphia*, 89 Pa. St. 210; *Thorpe* v. *Railroad Co.* 27 Vt. 150; Elliott on Roads and Streets, 565.

The demand of the city that an ordinance be obtained, or that a permit is required under penalty, is, under the facts in this case, unreasonable, and goes to destroy the very power of appellants to perform their public duties. It cannot, therefore, be a police regulation, for to be such it must be reasonable. *Railroad Co.* v. *Jacksonville*, 67 Ill. 37; *Lake View* v. *Tate*, 130 id. 247.

What are the relative rights of a city and a railway company at any street laid out over the railway by the city? This question has been fairly and completely answered by this court in *Railroad Co.* v. *Chicago*, 138 Ill. 453, and *Railway Co.* v. *Chicago*, 151 id. 348.

Courts will not interfere with the usual and ordinary operation of a railway, or the exercise of the discretion how best to operate it, which is vested in the corporation. *Smith* v. *Railroad Co.* 105 Ill. 511; *Railroad Co.* v. *Wiltse*, 116 id. 449; *O'Hare* v. *Railroad Co.* 139 id. 151.

Frank J. Loesch, (of counsel,) also for appellants.

William G. Beale, and Jesse B. Barton, for appellees:

Power to regulate carries power to require a permit or license, with a reasonable fee charge. *Kinsley* v. *Chicago*, 124 Ill. 360.

In *Illinois Central Railroad Co.* v. *Illinois*, 146 U. S. 387, and *United States* v. *Illinois Central Railroad Co.* 154 id. 225, it was held that though a railroad company was authorized to occupy three hundred feet in width, its selection and use of only two hundred feet limited it to take that two hundred feet, unless it should be authorized to afterwards take more.

To the extent to which the company had used its charter authority prior to municipal extension it would probably be protected against municipal interference, but the moment the municipal jurisdiction extended over the territory, all subsequent extensions under the charter powers fell under municipal control. *Railroad Co. v. Park Comrs.* 151 Ill. 204; Tiedeman on Police Powers, secs. 189, 190, 194.

The right of control by a municipality, in the exercise of police powers expressly delegated to it, we submit is no longer an open question in this State. *Railroad Co. v. Willenborg,* 117 Ill. 203 ; *Railroad Co. v. Chicago,* 140 id. 309, and 148 id. 141; *Railway Co. v. Chicago,* 148 id. 509; *Town of O'Fallon v. Railway Co.* 45 Ill. App. 572 ; *Snell v. Chicago,* 133 Ill. 122.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This is an appeal from an order of the Superior Court of Cook county, dismissing the bill of appellants, the Pittsburg, Fort Wayne and Chicago Railway Company and the Pennsylvania Company, for an injunction restraining the city of Chicago and its commissioner of public works from interfering with the construction, maintenance and operation by the complainants of a switch or side-track across Seventy-fifth street and Greenwood avenue. The question in the case is, whether the railroad companies had a right to construct a switch across these streets without first obtaining a permit from the city, issued in accordance with the terms of an ordinance authorizing it.

The facts material to a decision of the question here are, in brief, as follows: The Fort Wayne and Chicago Railroad Company, by its charter approved February 5, 1853, was authorized to construct a railroad from the Indiana State line to the city of Chicago. Section 9 of its charter gave it the right to construct its road upon or across any stream or water-course, road or highway, rail-

road or canal, which the route of its said road should intersect, but required it to restore the stream or water-course, road or highway, railroad or canal thus intersected to its former state, or in a sufficient manner not to have impaired its usefulness. Section 10 gave it the right to acquire within, or in the vicinity of, the city of Chicago, and to hold, use and occupy, such lands as it might acquire by purchase, donation or otherwise, for the purpose of constructing such depots, machine shops and other proper fixtures and buildings as might be requisite or necessary for the transaction of the business which might pass over and be connected with its road. On May 6, 1856, by an act of the legislature certain railroad companies were consolidated, under the name of the Pittsburg, Fort Wayne and Chicago Railway Company, which succeeded to all the property and franchises of the Fort Wayne and Chicago Railroad Company, and this consolidated railroad company located a line of railroad, with a right of way one hundred feet wide, from the Indiana State line to the southern boundary of the city of Chicago, the latter place being where Thirty-first street is now located. In 1854 the city had, by ordinance, granted permission to the original company to lay a track in any of its streets west of Clark street, from its southern boundary as far north as the south line of North street, and to lay down, maintain and operate one or more railroad tracks, with turn-outs and switches, as deemed necessary, on any ground acquired by it within the described boundaries. The Pittsburg, Fort Wayne and Chicago Railway Company, under this ordinance and the charter granted the Fort Wayne and Chicago Railroad Company, in 1856 to 1858 constructed and put in operation a line of road from Madison street, directly west of the Chicago river, due south to Englewood, and thence south-east to the State line. By an act of the legislature approved February 8, 1861, the Pittsburg, Fort Wayne and Chicago Railway Company succeeded to

all the rights of the last named company. When the line of railroad was first located and built it passed through no municipality south of the then southern boundary of Chicago, (now Thirty-first street,) and such highways as were crossed were restored to their former condition, as authorized by section 9 of the charter above set forth. Subsequently the town of Lake and village of Hyde Park were incorporated, and in 1870 these streets, Seventy-fifth and Greenwood avenue, were laid out and opened across the railroad by the village of Hyde Park. On July 15, 1889, that village and the town of Lake were annexed to and became a part of Chicago, and thereby the entire line of the Pittsburg, Fort Wayne and Chicago Railway Company in this State was brought within the city limits. In 1885 the city council had passed an ordinance as follows:

"Sec. 2089. Hereafter it shall not be lawful for any person or corporation to lay any railroad track or tracks in or upon any of the streets, avenues, alleys or other public places within the city of Chicago, without first procuring a permit in writing therefor from the commissioner of public works.

"Sec. 2090. Such permit shall be issued by the commissioner of public works in accordance with the terms of the respective ordinances under which the said tracks may be authorized to be laid, and shall specify in full the terms and conditions under which the same shall be constructed. For every such permit there shall be paid to the city the cost of issuing the same, and the expense of causing the construction under such permit to be superintended by the department of public works."

Section 2091 makes any person or corporation violating the previous sections liable to a fine, etc.

About the time of the filing of this bill the Pittsburg, Fort Wayne and Chicago Railway Company proceeded to lay an additional track over and across said streets without first procuring a permit, as required by this ordi-

nance, and the city interfering with its work in so doing, this bill for an injunction was filed.   It is alleged in the bill that a permit from the commissioner of public works was applied for and by him refused, but there was no averment that there was at the time an ordinance of the city authorizing the commissioner to issue such permit, or that the city was at any time requested to enact such an ordinance.   On the contrary, the theory of the bill is that the ordinance of December 7, 1885, *supra*, is of no binding force whatever against the complainant.

Counsel for appellants state the question for decision to be, can the city of Chicago, under its power (city charter, sec. 63, clauses 9, 25; 1 Starr & Curtis, 463, 465;) to lay out streets, regulate the use thereof, and to provide for a change of location, grade and crossings of any railroad, lay out a street over appellants' railroad and right of way, and thereafter prevent the appellants from constructing a necessary railway track through such street, within the limits of the right of way, until appellants shall have a special ordinance from the common council of the city so to do.   The argument in support of the negative of this proposition seems to attach importance to the fact that in this case, when the railroad was built, no municipality existed where the streets in question are located.

It has been repeatedly held by this court that every railroad company in the State holds its right of way subject to the right of the public to have highways and streets extended across the same.   No reason is or can be shown why this right in the public is limited to municipalities existing at the time of the locating and construction of the road.   The very reason why the right of a railroad company to the use of its right of way is subordinated to that of the public to extend highways and streets across it is, that otherwise the chartered right of the railroad company to acquire a right of way and construct its road through the State would deprive the people

generally of their right to travel and transact business by their own means of conveyance and transportation. Does this reason exist in the laws because the public necessity arises after the right of way is located? Certainly not. And we think it too clear to be controverted, that when, as in this case, the village of Hyde Park located Seventy-fifth street and Greenwood avenue, the rights of the public and the railroad company became precisely the same as they would have been if the village had been organized, or even the streets laid out, before the right of way was established and the road built. In the case of extending a street across a right of way, the joint rights of the parties were stated in *Chicago and Northwestern Railway Co.* v. *Chicago*, 151 Ill. 348, to "be the same, and subject to the same restrictions and limitations as such rights are enjoyed at the crossings of public streets by railways." That is to say, whether the street or railroad is located first makes no difference—the rights of the public and of the railroad company are the same. Whether the municipality which extended or located the street existed when the right of way was acquired or not, can, as we think, be of no possible consequence. The crossing being legally established by the authorities of Hyde Park, it became subject to control under all ordinances lawfully in force in the city of Chicago at the time of the annexation. (*McGurn* v. *Board of Education*, 133 Ill. 122.) The question for decision may therefore be treated as though the facts were as stated in the foregoing proposition announced by counsel,—that is to say, as though the city of Chicago itself had laid out the streets over appellants' railroad and right of way. In such a case the rights of the city on behalf of the public and of the railroad, in the use of the crossing, have been frequently defined by the decisions of this court. In *Chicago and Northwestern Railway Co.* v. *Chicago, supra,* we said (p. 355): "These rights to its use and occupancy co-exist—the city, for the use of the public, acquiring the right to extend

and open the street over and across the railroad and the railroad right of way, and thereafter to maintain and keep the same in repair, subject only to its joint use by the railroad; and the railroad retaining the right to use and occupy the same for the legitimate and reasonable management and operation of its railroad and transaction of its business, *subject to all lawful rules and regulations applicable to public street crossings.*" And in the late case of *Chicago and Northwestern Railway Co.* v. *Town of Cicero,* 157 Ill. 48, we expressly held that a railroad company, after condemnation of its right of way for a public street, would retain the right to place additional tracks across the street, if it was necessary to do so in the operation and management of its road, "*consistent with the right of the public to use the street.*"

It does not follow, however, as seems to be understood by counsel, that this right remaining in the railroad company may be exercised free from all restraint or regulation on the part of the city. It is assumed in their argument that to require the railroad company, having the right to lay down additional tracks, to obtain a permit in pursuance of a proper ordinance to do so, is "to deprive it of the exercise of the franchise conferred upon it,—deprive it of its property without due process of law —impair the obligation of its contract with the State." We are unable to see why, on the same line of reasoning, it might not be contended that the railroad company could run its trains across these streets free from interference by public authorities. The right in the one case is no clearer than in the other. Both must be exercised with due regard to the rights of the public. The power to see that this is done has been lodged in the city by the legislature. It is an authorized police regulation, and unless it can be said to be unreasonable, the authority of the legislature to confer it and the right of the city to exercise it cannot be gainsaid. Will it be contended that because a railroad company may, under its chartered

rights, lay tracks across public streets, it may do so when, where and in the manner it pleases, without regard to the rights of the public? Can every street in the city of Chicago crossed by a railroad be torn up, obstructed and rendered impassable by the public at the will and discretion of the agents and employees of the company? Will any one say it is unreasonable to require the exercise of these rights under police control and regulation? The city is charged with the duty of keeping its streets in a reasonably safe condition, and, so far as it can be done consistently with private rights, free from obstructions. It is not only reasonable, but absolutely necessary, in the public interest, that its officers and agents, in the performance of that duty, should know when and where and in what manner additional tracks are to be laid, and reasonably restrain and regulate the work. To do so in no way interferes with the chartered rights of a company, or deprives it of its property, or impairs its contract with the State.

It was said in *Galena and Chicago Union Railroad Co.* v. *Loomis*, 13 Ill. 548: "That the legislature has the power, by the enactment of general laws from time to time, as the public exigencies may require, to regulate corporations in the exercise of their franchises, so as to provide for the public safety, admits of no doubt. * * * The act of corporation confers on the company certain privileges, but in the exercise of those privileges the corporation is just as much subject to the general police laws of the State as is an individual pursuing his lawful business,"—citing authorities. This doctrine has been recognized by this court in many later decisions. And it may here be also remarked, as said by the late Justice SCHOLFIELD in his separate opinion in *Chicago and Alton Railroad Co.* v. *Joliet, Lockport and Aurora Railway Co.* 105 Ill. 388, reasonable police regulations have been upheld "without regard to whether the streets or highways were laid out or the village or city was platted and has been built up

since or before the granting of the railroad charter,"—citing authorities.

It is conceded that the city cannot, in the exercise of this or any other police power, act unreasonably. It could neither arbitrarily refuse to pass an ordinance permitting the laying of tracks, or impose unreasonable burthens or restrictions upon the company. But no question of that kind is or can be properly raised in this case, for, as we have already said, the right here insisted upon by the company is that of putting down the tracks in question independently of and free from interference on the part of the city. It need scarcely be said that if a proper application had been made to the city authorities under the foregoing ordinances, and refused, without just and legal excuse therefor, the remedy would have been by *mandamus*, and not by this proceeding in equity.

We think the court below decided this case properly, and its decree will be affirmed.           *Decree affirmed.*